Joshua H. Haffner, SBN 188652
  jhh@haffnerlawyers.com
Alfredo Torrijos, SBN 222458
  at@haffnerlawyers.com
Vahan Mikayelyan, SBN 337023
  vh@haffnerlawyers.com
**HAFFNER LAW PC**
15260 Ventura Blvd., Suite 1520
Sherman Oaks, California 91403
Tel: (213) 514-5681 / Fax: (213) 514-5682

Shaun C. Setareh, SBN 204514
  shaun@setarehlaw.com
Thomas A. Segal, SBN 222791
  thomas@setarehlaw.com
**SETAREH LAW GROUP**
420 N Camden Drive, Suite 100
Beverly Hills, CA 90210
Tel: (310) 888.7771 / Fax: (310) 888.0109

*Attorneys for Plaintiff David Ventura
and the Proposed Class*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID VENTURA, individually and as representative of a class of participants and beneficiaries and on behalf of the Lithia Motors, Inc. 401(K) Plan, | Case No. |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | |
| LITHIA MOTORS, INC., | |
| Defendant. | |

**CLASS ACTION COMPLAINT**

Plaintiff David Ventura ("Ventura" or "Plaintiff"), individually and on behalf of all others similarly situated, and on behalf of the Lithia Motors, Inc. 401(k) Plan (the "Plan"), makes the following allegations based upon information and belief, except as to those allegations specifically pertaining to Plaintiff and her counsel, which are based on personal knowledge. Plaintiff brings this action for monetary damages, disgorgement, and equitable relief under the Employee Retirement Income Security Act of 1974 ("ERISA").

## NATURE OF THE ACTION

1.    This action arises out of Defendant Lithia Motors, Inc.'s ("Defendant" or "Lithia") wrongful conduct in connection with the Lithia Motors, Inc. 401(k) Plan (the "Plan"), a defined contribution employee retirement plan with over $1.03 billion in net assets and more than 29,000 participants as of December 31, 2024.  As set forth herein, Defendant breached its fiduciary duties under the Employee Retirement Income Security Act of 1974 ("ERISA") by: (i) diverting at least $17.3 million in forfeited plan assets to reduce its own employer contribution obligations rather than using those funds for the benefit of plan participants; (ii) paying excessive and prohibited administrative fees to parties in interest, including recordkeeping fees to Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") that grew from approximately $961,929 in 2020 to $1,633,011 in 2024 and far exceeded market rates for comparable plans; (iii) imprudently transitioning the Plan's target-date fund suite – holding approximately $570.6 million (over 57% of Plan assets) – from transparent, SEC-regulated mutual funds into unregistered, structurally opaque collective investment trusts ("CITs") without ensuring adequate fee transparency or scrutinizing the hidden indirect compensation extracted by conflicted service providers; and (iv) failing to properly monitor the Plan's management and administration.  In this action, Plaintiff seeks damages and equitable relief in connection with Defendant's wrongful conduct in misusing and mismanaging Plan assets.

## JURISDICTION AND VENUE

2.    This action is brought under 29 U.S.C. §§ 1132(a), (e), (f) and (g) as it involves a claim by Plaintiff for employee benefits under an employee benefit plan

— 2 —

**CLASS ACTION COMPLAINT**

regulated and governed by ERISA.  Subject matter jurisdiction is predicated under these code sections as well as 28 U.S.C. § 1331 as this action involves a federal question.

3.      The Court has personal jurisdiction over Defendant because ERISA provides for nationwide service of process, and Defendant transacts business and has significant contacts in this District. See 29 U.S.C. § 1132(e)(2).

4.      Venue is proper in this judicial district pursuant to 29 U.S.C. §1132(e)(2), which provides that an ERISA action may be brought in the district where the plan is administered, where the breach took place, or where a defendant resides or may be found. Venue is proper here because Plaintiff is a resident of this district, the Plan is administered in part in this district through Defendant's operations in California, and Defendant may be found in this district through its substantial and continuous business operations within the State of California.

## THE PARTIES

5.      Plaintiff David Ventura is an individual and resident of California who was employed by Lithia Motors and was a participant in the Plan at issue within the statute of limitations for each cause of action pled.

6.      The Lithia Motors, Inc. 401(k) Plan (the "Plan") is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. §1002(2)(A) and § 1002(34) and is subject to the provisions of ERISA pursuant to 29 U.S.C. § 1003(a).  The Plan is identified by Employer Identification Number 93-0572810 and Plan Number 003. The Plan was originally established with an effective date of January 1, 1980, and was formerly known as the Lithia Motors, Inc. Salary Reduction Profit Sharing Plan.  The Plan covers eligible employees of Lithia and its subsidiaries.  Participants may make elective deferral contributions, including through payroll withholding, and may make rollover contributions from other qualified plans.

7.      Defendant Lithia Motors, Inc. is a corporation authorized to conduct and actually conducting business in the State of California, and is the Plan Sponsor and Plan Administrator of the Plan, headquartered at 150 N. Bartlett Street, Medford, Oregon 97501.

— 3 —

**CLASS ACTION COMPLAINT**

8. Lithia Motors exercised discretionary authority and/or control over the management and/or administration of the Plan, and/or rendered investment advice regarding the Plan, and is a fiduciary of the Plan, including pursuant to 29 U.S.C. §1002(21)(A).

9. Lithia Motors acted through its officers, including its Board of Directors, to perform Plan related fiduciary functions in the course and scope of their business. Lithia Motors and its Board appointed other Plan fiduciaries on a 401(k) plan committee (the "Committee") to manage the operation and administration of the Plan. Lithia Motors has delegated certain fiduciary responsibilities to the Committee, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Lithia Motor are fiduciaries of the Plans, within the meaning of 29 U.S.C. § 1002(21)(A).

10. The Plan is administered by the Committee. As a plan administrator, the Committee is a fiduciary responsible for the day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). The Committee has authority and responsibility for the control, management, and administration of the Plan in accordance with 29 U.S.C. § 1102(a), with all powers necessary to properly carry out such responsibilities.

## THE PLAN

**A. PLAN STRUCTURE AND SERVICE PROVIDERS.**

11. The assets of the Plan are held in a trust fund pursuant to 29 U.S.C. §1103(a). The Plan is funded by a combination of employee/participant contributions (usually paid through wage withholdings) and employer contributions, which are deposited into the Plan's trust fund. Once deposited into the Plan's trust fund, all employee/participant and employer contributions become assets of the Plan.

12. Defendant contracted with Bank of America ("BANA") to serve as the Plan's custodian and trustee and for Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch"), an affiliate of Bank of America, to serve as the Plan's recordkeeper and third-party administrator.

/ / /

— 4 —

**CLASS ACTION COMPLAINT**

**B.      PLAN SIZE AND GROWTH.**

13.    The Plan is a large defined contribution plan with significant assets.  Public filings report net assets available for benefits at year end of approximately: $451,980,057 (2019), $572,930,453 (2020), $730,182,961 (2021), $655,333,166 (2022), $863,280,801 (2023), and $1,030,165,595 (2024).

14.    The Plan has experienced extraordinary growth in net assets over the relevant period, nearly tripling in size from approximately $344 million to over $1.03 billion:

| Plan Year-End | Net Assets | Year-Over-Year Change |
|---|---|---|
| 12/31/2018 | $344,320,429 | — |
| 12/31/2019 | $451,980,057 | +$107,659,628 |
| 12/31/2020 | $572,930,453 | +$120,950,396 |
| 12/31/2021 | $730,182,961 | +$157,252,508 |
| 12/31/2022 | $655,333,166 | -$74,849,795 |
| 12/31/2023 | $863,280,801 | +$207,947,635 |
| **12/31/2024** | **$1,030,165,595** | **+$166,884,794** |

15.    By December 31, 2024, the Plan held over $1.03 billion in net assets, making it a "mega-plan" by industry standards.  A plan of this size should have been able to leverage its massive buying power to negotiate significantly lower recordkeeping fees and gain access to the lowest-cost share classes and investment vehicles available in the marketplace.

16.    The Plan also has a large participant base and has experienced substantial growth in the number of participants over the relevant period.  Based on the Plan's Form 5500 filings, the 2022 plan year reported 26,227 total participants at the beginning of the year and 29,235 total participants at the end of the year, with 26,052 participants holding account balances.  Of those, 2,713 participants had terminated employment with less than

**CLASS ACTION COMPLAINT**

100% vesting, generating the forfeited account balances at issue in this action. The Plan's Form 5500 filings report that the number of participants with account balances at the end of the plan year was approximately: 16,311 (2019), 16,203 (2020), 23,283 (2021), 26,052 (2022), 26,750 (2023), and 26,680 (2024).

**C.     CONTRIBUTIONS, VESTING SCHEDULE, AND FORFEITURES.**

17.     Under the Plan, participants' accounts are credited with participant contributions and allocations of employer contributions and Plan earnings, and participants' accounts are charged with an equal, per-capita allocation of the Plan's administrative expenses.

18.     The Plan's employer matching formula changed over the relevant period. From 2019 to 2020, Defendant matched 55% on the first $2,500 of employee contributions.   In 2021, the match increased to 70% on the first $2,500.   In 2022, the match increased to 85% on the first $2,500.   Beginning in 2023, Defendant matched 100% on the first $2,500 of employee contributions.   For plan years 2019 through 2021, participants were required to be employed on the last day of the plan year to be eligible for the employer contribution.

19.     Participants are immediately vested in their own contributions (and earnings thereon).   Vesting in employer contributions is graded, which causes participants who terminate employment before full vesting to forfeit the non-vested portion of employer contributions.   In 2019 (and again in 2022), the Plan disclosed that participants were 1% vested upon participation and became 20% vested after two years of service, vesting 20% per year thereafter until 100% vested after six years of credited service.   By 2024, the Plan disclosed a vesting schedule under which participants became 20% vested after one year of service and then became 100% vested after five years of credited service.

20.     The lengthy graded vesting schedules, when combined with the high employee turnover inherent in the automotive retail industry (Lithia's primary business), generate significant forfeitures each year, making the disposition of those forfeitures a critical fiduciary decision.

— 6 —

**CLASS ACTION COMPLAINT**

21.     The Plan maintains forfeiture accounts for forfeited non-vested amounts. The Plan disclosed that forfeitures are recorded in a separate account and are used to reduce future employer contributions and otherwise as permitted by the Plan.

22.     The Plan's public filings report substantial forfeiture balances at year end, including, for example, forfeited non-vested accounts totaling $1,533,815 at December 31, 2019; approximately $2,483,000 at December 31, 2021; approximately $2,548,000 at December 31, 2022; approximately $967,000 at December 31, 2023; and approximately $2,376,000 at December 31, 2024.

23.     The Plan's public filings further show that Defendants used forfeitures to reduce Lithia's employer contribution obligations. The Plan disclosed, for example, that employer contributions were reduced by $2,111,000 in 2022, $3,671,000 in 2023, and $7,448,000 in 2024 from forfeited accounts.

## FACTUAL ALLEGATIONS

**A.     DEFENDANT'S IMPOSITION OF EXCESSIVE AND PROHIBITED ADMINISTRATION FEES.**

24.     Despite the Plan's size and economies of scale, the Plan reported substantial annual administrative expenses and disclosed that those expenses are charged to participant accounts on a per-capita basis.

25.     The Plan's public filings report administrative expenses of approximately: $1,070,955 (2019), $977,532 (2020), $1,135,627 (2021), $1,461,614 (2022), $937,204 (2023), and $1,054,023 (2024).

26.     Based on the Plan's reported administrative expenses and reported participants with account balances at year end, the Plan's annual administrative expenses equate to approximately: $66 per participant (2019), $60 per participant (2020), $49 per participant (2021), $56 per participant (2022), $35 per participant (2023), and $40 per participant (2024).

27.     The Plan's public Form 5500 filings identify Merrill Lynch as the Plan's recordkeeper and report substantial direct compensation paid to that recordkeeper. For

— 7 —

**CLASS ACTION COMPLAINT**

example, the Plan's 2024 Form 5500 Schedule C reports $1,633,011 in direct compensation paid to the recordkeeper.

28.  The Plan's public filings likewise report other professional service fees paid from Plan assets, including audit and consulting fees.  For example, the Plan's 2024 Form 5500 Schedule C reports direct compensation paid to KBF CPAs as the Plan's accountant and auditor and to Deschutes Investment Consulting as the Plan's consultant.

29.  Based on the Plan's reported participants with account balances at the end of 2024, the Plan's reported 2024 direct recordkeeping compensation of $1,633,011 equates to at least approximately $61 per participant with an account balance, before considering any additional indirect compensation (including, for example, compensation paid through investment-related arrangements that are not separately itemized as an "administrative expense" line item).

30.  The Plan's 2020 Form 5500 Schedule C similarly reports substantial direct compensation paid to the Plan's recordkeeper, including $961,929 in direct compensation paid to Merrill Lynch as recordkeeper.

31.  The Plan invests in mutual funds, collective investment vehicles, and Lithia common stock.  The Plan's public disclosures report that, as of December 31, 2024, the Plan held $618,130,795 in common collective trust funds, $332,036,474 in registered investment companies, and $36,976,215 in Lithia common stock.

32.  The Plan's Form 5500 Schedule of Assets for 2024 lists, among the Plan's collective trust holdings, a suite of JPMorgan collective trust target date funds (JPMCB SmartRetirement Passive funds) and other collective trusts and index options, as well as a stable value option and participant loans.

33.  The Plan also disclosed that certain Plan investments are managed by BANA, the Plan's trustee, and that certain investment fees are paid by the trustee and reflected in investment income or loss (i.e., netted against returns), rather than appearing as separately itemized line-item administrative expenses.

///

— 8 —

**CLASS ACTION COMPLAINT**

34. Under ERISA, a fiduciary must act prudently and exclusively in the interest of participants. This requires a diligent process to verify the value, holdings, and risks of Plan investments.

35. Defendant allowed BANA and its affiliate Merrill Lynch to act under the Plan as trustee, custodian, recordkeeper, and/or investment manager, which presents conflicts of interest that implicate prohibited transactions under ERISA.

36. By permitting BANA, either directly or indirectly through its affiliate Merrill Lynch, to perform recordkeeping services and provide investment advisory services, Defendant has engaged in prohibited transactions and allowed extra costs that inflated per-participant expenses. Plaintiff is informed and believes, and on that basis alleges, that Defendant has also allowed BANA to use its affiliate's role as recordkeeper to obtain information for use in its role as investment advisor.

37. The direct compensation paid by the Plan to Merrill Lynch, as reported on Schedule C of the Plan's Form 5500 Annual Report, escalated substantially during the relevant period despite the Plan's growth in assets, which should have provided increased bargaining leverage:

| Plan Year | Direct Compensation to Merrill Lynch | Indirect Compensation |
|---|---|---|
| 2019 | $1,032,951 | Yes (undisclosed amount) |
| 2020 | $961,929 | Yes (undisclosed amount) |
| 2021 | $1,052,682 | Yes (undisclosed amount) |
| 2022 | $1,380,206 | Yes (undisclosed amount) |
| 2023 | $1,520,067 | Yes (undisclosed amount) |
| 2024 | $1,633,011 | Yes (undisclosed amount) |

38. In addition to the direct compensation detailed above, Merrill Lynch also received eligible indirect compensation in undisclosed amounts in each year. The indirect compensation was not reported in dollar amounts because the Plan checked "Yes" on the eligible indirect compensation disclosure line on Schedule C, exempting it

— 9 —

**CLASS ACTION COMPLAINT**

from dollar reporting.

39.    Administrative expenses are charged to participants on a per capita basis (equal amount per participant), as disclosed in the Plan's Notes to Financial Statements. Using 2022 data as a reference point, with approximately 26,052 participants holding account balances and total administrative expenses of $1,461,614, the per-participant charge was approximately $56.

40.    A reasonable market rate for recordkeeping services for a plan of Lithia's size (with over $1 billion+ assets and approximately 26,000 participants) is $20 or less per participant.  For example, during the class period, the *Disney Savings and Investment Plan* paid between $3 and $11 per participant; the *Providence Health & Services Plan* paid between $4 and $26 per participant; and the *CBRE 401(k) Plan* paid between $18 and $31 per participant for identical or substantially similar services.

41.    BANA and Merrill Lynch were fiduciaries and/or parties in interest of the Plan.   Accordingly, the payment of fees to BANA and Merrill Lynch constituted prohibited transactions under ERISA.

42.    Defendant's charges for administrative fees, including recordkeeping fees, for BANA and Merrill Lynch are excessive and unreasonable, particularly in light of the Plan's status as a $1 billion+ mega-plan with substantial bargaining power.

43.    Defendant allowed unreasonably excessive administrative expenses to be incurred by participants.  The Plan at issue, and Plaintiff's interests in it, have been harmed by Defendant's inflated, conflicted administrative fees.

**B.    DEFENDANT'S MISUSE OF FORFEITED PLAN ASSETS.**

44.    Participants who have a break in service prior to full vesting of employer contributions forfeit the balance of unvested employer contributions, and Defendant exercises control over how these Plan assets are thereafter allocated.

45.    Defendants exercised control over forfeited Plan assets and over how the Plan's administrative expenses were funded and allocated.  Yet, despite disclosing that participants' accounts are charged a per-capita allocation of administrative expenses,

**CLASS ACTION COMPLAINT**

Defendants consistently used forfeitures to reduce Lithia's employer contribution obligations.

46.    For example, in 2022, the Plan reported administrative expenses of $1,461,614 while Lithia's employer contributions were reduced by $2,111,000 from forfeited accounts.  In 2023, the Plan reported administrative expenses of $937,204 while employer contributions were reduced by $3,671,000 from forfeited accounts.  In 2024, the Plan reported administrative expenses of $1,054,023 while employer contributions were reduced by $7,448,000 from forfeited accounts.

47.    Plaintiff is informed and believes, and on that basis alleges, that as part of a wrongful pattern and practice, Defendant has wrongfully and consistently used forfeited nonvested plan assets for its own benefit, to reduce future employer contributions, rather than for the benefit of Plan participants.  Defendant's use of Plan forfeited assets to offset its employer contributions violates ERISA statutes, including but not limited to, 29 U.S.C. §§1103(c)(1), 1104(a)(1), and 1106.

48.    The Plan's Form 11-K Annual Reports and Form 5500 financial statements disclose the following forfeiture activity during the relevant period:

/ / /

/ / /

/ / /

— 11 —

**CLASS ACTION COMPLAINT**

| Year | Forfeitures Available (Year-End) | Forfeitures Used During Year | Stated Purpose |
|---|---|---|---|
| 2019 | $1,533,815 | — [1] | Reduce future employer contributions |
| 2020 | $2,064,000 | $2,078,000 | Reduce employer contribution |
| 2021 | $2,483,000 | $2,016,000 | Reduce employer contribution |
| 2022 | $2,548,000 | $2,111,000 | Reduce employer contribution |
| 2023 | $967,000 | $3,671,000 | Reduce employer contribution |
| 2024 | $2,376,000 | $7,448,000 | Reduce employer contribution |
| | TOTAL: | $17,324,000+ | All used to benefit the employer |

49. In 2020, Defendant's own filings stated: "Forfeitures totaling approximately $2,078,000 were used to reduce the 2020 employer contribution."

50. In 2021, Defendant's filings stated: "Forfeitures totaling approximately $2,016,000 were used to reduce the 2021 employer contribution."

51. In 2022, Defendant's filings stated: "Forfeitures totaling approximately $2,111,000 were used to reduce the 2022 employer contribution."

52. In 2023, Defendant's filings stated: "Forfeitures totaling approximately $3,671,000 were used to reduce the 2023 employer contribution."

53. In 2024, Defendant's filings stated: "Forfeitures totaling approximately $7,448,000 were used to reduce the 2024 employer contribution." Notably, the 2024 11-

---

[1] The 2019 11-K states only that forfeitures "are used to reduce future employer contributions" without specifying the dollar amount used for that plan year.

**CLASS ACTION COMPLAINT**

K added new language stating that forfeitures were available "to reduce future contributions and to be used as permitted in the Plan," suggesting awareness by Defendant of the legal scrutiny surrounding forfeiture practices, yet the forfeitures continued to be used exclusively to offset employer contributions.

54. The amount of forfeitures used to reduce employer contributions escalated dramatically, from approximately $2,078,000 in 2020 to $7,448,000 in 2024 – a 258% increase – corresponding to the Plan's rapid growth in participants and the high turnover rates typical of the automotive retail industry.

55. Defendant's allocation of forfeited fund assets to reduce its own employer contributions benefited Defendant, but harmed the Plan and participants in the Plan, by reducing Plan assets, not allocating forfeited funds to participants' accounts, and/or by causing participants to incur expenses that could otherwise have been covered in whole or in part by forfeited funds.

56. By choosing to use forfeited Plan assets to benefit itself and not the Plan or the Plan's participants, Defendant placed its own interests above the interests of the Plan and its participants.

57. In each of 2022, 2023, and 2024, the amount of forfeitures used to reduce Lithia's employer contribution obligations exceeded the Plan's annual administrative expenses charged to participant accounts, indicating that forfeitures were sufficient to cover those administrative expenses in whole and still leave substantial forfeiture balances remaining.

58. Between 2022 and 2024 alone, the Plan used at least $13,230,000 of forfeited Plan assets to reduce Lithia's employer contributions, while the Plan reported at least $3,452,841 in administrative expenses over the same period that were charged to participant accounts on a per-capita basis.

59. Upon information and belief, the Plan's governing document granted Defendants the discretion to use forfeited non-vested accounts to either pay Plan administrative expenses or reduce employer contributions. Faced with this choice,

— 13 —

**CLASS ACTION COMPLAINT**

Defendants breached their Duty of Loyalty by systematically resolving this discretion in their own favor, offsetting $17.3 million of Lithia's corporate matching debt rather than sparing participants from millions of dollars in out-of-pocket "per capita" fee deductions.

60.     Defendants' consistent practice of using forfeitures to offset Lithia's employer contributions reduced Lithia's costs while Plan participants continued to bear Plan administration costs through per-capita charges and through the reduction of Plan assets available for participants' retirement.

61.     A prudent and loyal fiduciary would have evaluated whether Plan forfeitures should be used to pay Plan administrative expenses (thereby reducing the per-capita charges to participants) instead of using those forfeitures to reduce Lithia's employer contribution obligations.

62.     Upon information and belief, Defendants failed to engage in a reasoned, loyal, and prudent process to ensure that (a) the Plan's administrative and recordkeeping costs (including direct and indirect compensation) were reasonable, and (b) forfeited Plan assets were used in a manner that maximized benefits to Plan participants rather than reducing Lithia's costs.

## C.     DEFENDANT'S IMPRUDENT SELECTION AND RETENTION OF PLAN INVESTMENTS.

63.     The Plan offers a mix of common collective trust funds, registered investment companies (mutual funds), Lithia Motors company stock, and a stable value fund.  Defendant, as a fiduciary of the Plan, had a duty to prudently select, monitor, and where appropriate, replace the Plan's investment options.

64.     Throughout the Class Period and through at least December 31, 2023, the Plan's target-date fund ("TDF") lineup consisted of JPMorgan SmartRetirement Blend R6 mutual fund shares – registered investment companies classified as Level 1 assets in the Plan's fair value hierarchy.  As of December 31, 2023, these JPMorgan SmartRetirement Blend R6 mutual funds held approximately $472.7 million in Plan assets across eleven target-date vintages, representing more than 56% of the Plan's total

— 14 —

**CLASS ACTION COMPLAINT**

investments

65.     Between plan years 2023 and 2024, Defendant caused the Plan to replace the entire JPMorgan SmartRetirement Blend R6 mutual fund lineup with JPMCB SmartRetirement Passive ("PASV") collective investment trust ("CIT") units.  As of December 31, 2024, these CIT units held approximately $570.6 million in Plan assets – more than 57% of the Plan's total investments:

| Fund | Balance (12/31/2024) |
|---|---|
| JPM SmartRetirement CF A | $  15,200,939 |
| JPM SmartRetirement 2020 | $  15,942,761 |
| JPM SmartRetirement 2025 | $  43,160,276 |
| JPM SmartRetirement 2030 | $  67,717,459 |
| JPM SmartRetirement 2035 | $  65,765,003 |
| JPM SmartRetirement 2040 | $  67,410,428 |
| JPM SmartRetirement 2045 | $  73,834,058 |
| JPM SmartRetirement 2050 | $  75,006,408 |
| JPM SmartRetirement 2055 | $  69,815,424 |
| JPM SmartRetirement 2060 | $  73,430,162 |
| JPM SmartRetirement 2065 | $    3,284,816 |
| **TOTAL TDF SUITE:** | **$ 570,567,734** |

66.     The transition is reflected on the Plan's balance sheet. As shown in the Plan's 2024 Form 11-K, Plan assets classified as "registered investment companies" fell from $620,199,623 at year-end 2023 to $332,036,474 at year-end 2024 – a decline of approximately $288.2 million. During the same period, assets classified as "common collective trust funds" increased from $173,324,860 to $618,130,795 – a gain of approximately $444.8 million. The net effect was to transfer the majority of the Plan's assets from registered investment vehicles subject to the Investment Company Act of 1940 ("1940 Act") to unregistered collective trusts exempt from 1940 Act requirements.

/ / /

— 15 —

**CLASS ACTION COMPLAINT**

67.    Unlike mutual funds, CITs are not registered under the 1940 Act and are not subject to regulation by the Securities and Exchange Commission ("SEC").  CITs do not file public prospectuses.  CITs are not required to publish standardized expense ratios.  CITs are not required to make public the same level of portfolio composition, performance, or fee information that mutual funds must disclose under the 1940 Act and SEC regulations.  CITs are instead governed by the Office of the Comptroller of the Currency (for national bank trusts) or state banking regulators, under a regulatory framework that imposes substantially fewer disclosure obligations.

68.    The Plan's own financial statements confirm the reduced transparency of CIT holdings.  Under the fair value hierarchy required by generally accepted accounting principles ("GAAP"), the Plan's 2023 Form 11-K classified its mutual fund holdings (including all TDFs) as Level 1 assets – the most transparent category, reflecting "unadjusted quoted prices for identical assets or liabilities in active markets."  By contrast, the Plan's 2024 Form 11-K reports the replacement CIT holdings as "[i]nvestments measured at NAV," entirely outside the fair value hierarchy.  The 2024 Form 11-K states that these common collective trust funds are "valued at net asset value ('NAV') per share or its equivalent of the funds, which are based on the fair value of the funds' underlying assets."  This means that more than $618 million in Plan assets – including the $570.6 million in TDFs that are the default investment for the overwhelming majority of participants – are no longer subject to Level 1 fair value measurement and instead rely on NAV-based valuations provided by the CIT trustee itself.

69.    Neither the Plan's 2024 Form 11-K, nor the 2024 Schedule of Assets (Held at End of Year), nor the 2024 Form 5500, discloses the expense ratios, management fees, or total annual operating costs of the JPMCB SmartRetirement Passive CIT funds.  While the SmartRetirement Blend R6 mutual funds were required by SEC regulation to publish expense ratios and provide prospectuses that disclosed all fees, the replacement CIT vehicles carry no such obligation.  The Plan's filings are thus silent as to the actual cost

**CLASS ACTION COMPLAINT**

that participants bear through these investment vehicles – even though these vehicles hold the majority of the Plan's assets.

70.    CITs deduct investment management fees, trustee fees, and administrative expenses directly from the fund's NAV before the NAV is reported to participants. Unlike mutual fund expense ratios, which are standardized, publicly reported, and readily comparable across providers, CIT fees are embedded within the NAV calculation and are not required to be separately itemized in any public filing. As a result, participants in the Plan have no standardized, publicly available means of determining the total fees they are paying through the Plan's CIT holdings, nor any standardized means of comparing those fees against alternative investment options offered by competing providers.

71.    A prudent fiduciary who transitions more than half a billion dollars in participant retirement assets from publicly regulated mutual funds to unregistered CITs has a duty to ensure that the transition does not diminish the transparency of fees and investment information available to participants.  Defendants failed to discharge this duty. Neither the Plan's Form 5500 filings, nor the Form 11-K annual reports, nor any other publicly available Plan document reviewed by Plaintiff discloses the total expense ratios or all-in costs of the JPMCB SmartRetirement Passive CIT funds, the basis on which these funds were selected over competing CIT or mutual fund alternatives, or any analysis showing that the CIT fees are reasonable in light of the services provided.

72.    On information and belief, the JPMCB SmartRetirement Passive CIT funds pay revenue-sharing, sub-transfer agency, or other indirect compensation to Merrill Lynch and/or BANA out of the CIT's management fees or other fund-level expenses. The Form 5500 Schedule C for each year in the Class Period reports that Merrill Lynch received "eligible indirect compensation" from sources other than the Plan or Plan sponsor, yet no dollar amount is disclosed for this indirect compensation in any filing year.  The transition from mutual funds – which are required to disclose revenue-sharing arrangements in their prospectuses – to CITs – which are not – further obscures the total compensation flowing to the Plan's recordkeeper and makes it more difficult for

— 17 —

**CLASS ACTION COMPLAINT**

participants and regulators alike to evaluate whether the Plan's total fee structure is reasonable.

73.    On information and belief, the JPMCB SmartRetirement Passive CIT funds are managed by JPMorgan Chase Bank, N.A., and the CIT trustee is JPMorgan Chase Bank, N.A. The Plan's custodian and trustee is BANA, and its recordkeeper is Merrill Lynch – both affiliates of Bank of America Corporation.  A prudent fiduciary would have scrutinized whether the embedded fee arrangements between the CIT manager (JPMorgan) and the Plan's recordkeeper (Merrill Lynch/BANA) involve revenue-sharing, sub-transfer agency fees, or other payments that may create conflicts of interest and increase the total cost borne by participants.  Defendant either failed to conduct this analysis or conducted it and accepted an arrangement that prioritized relationships between institutional service providers over the interests of Plan participants.

74.    The practical effect of the transition is that participants in the Plan can no longer look up their TDF's expense ratio on any public financial website, compare it against Morningstar or other independent databases, or read a standardized prospectus disclosing all fees and risks.  Participants who held JPMorgan SmartRetirement Blend R6 mutual fund shares through December 2023 could access the fund's SEC-mandated prospectus, annual report, and publicly reported expense ratio. Participants who now hold JPMCB SmartRetirement Passive CIT units have access to none of these standardized disclosures. Defendant has provided no substitute mechanism for ensuring that participants can evaluate the costs and performance of their default retirement investment with the same rigor that mutual fund regulation affords.

75.    By transitioning approximately $570.6 million in Plan assets from regulated mutual funds to unregistered CITs without ensuring that participants retained access to standardized fee disclosures, and without publicly documenting the fee comparison underlying the decision, Defendant failed to act "with the care, skill, prudence, and diligence" required of ERISA fiduciaries under 29 U.S.C. § 1104(a)(1)(B).  A prudent fiduciary evaluating a CIT transition would, at minimum, (a) obtain and document the

— 18 —

**CLASS ACTION COMPLAINT**

all-in expense ratio for each CIT vintage; (b) compare those costs against the expense ratios of the incumbent mutual funds and competing alternatives; (c) evaluate the total cost to participants including any revenue-sharing or indirect compensation flowing from the CIT to the Plan's service providers; (d) assess whether the reduced transparency of the CIT structure was offset by measurably lower fees or superior performance; and (e) ensure that participants received clear, standardized disclosure of the fees embedded in their new default investment. On information and belief, Defendant failed to perform one or more of these steps.

76.    By selecting a CIT structure that reduces fee transparency while maintaining or increasing the flow of indirect compensation to the Plan's recordkeeper, Defendant failed to act "solely in the interest of the participants and beneficiaries" and "for the exclusive purpose of providing benefits to participants and their beneficiaries" as required by 29 U.S.C. § 1104(a)(1)(A).  The opacity inherent in the CIT structure benefits the Plan's service providers – who can collect revenue-sharing and other indirect compensation without public scrutiny – at the expense of participants – who can no longer evaluate whether those costs are reasonable.  Defendant had a duty to ensure that any investment vehicle transition served the exclusive interests of Plan participants, not the institutional convenience or commercial preferences of the Plan's service providers.

77.    The transition to CITs also impairs the Committee's ongoing ability to monitor the Plan's investments as required by 29 U.S.C. § 1104(a)(1)(B).  Mutual funds provide fiduciaries with publicly available, independently audited, and standardized performance and fee data that can be benchmarked against peers using widely available databases. CITs do not provide this standardized data.  By selecting CIT vehicles for the Plan's default investment – the single investment option that holds the largest share of Plan assets and that determines retirement outcomes for participants who do not make an affirmative investment election – Defendant has made its own ongoing monitoring obligation more difficult to fulfill, and has made it virtually impossible for participants to independently verify that fiduciaries are fulfilling that obligation.

— 19 —

**CLASS ACTION COMPLAINT**

78.    Unlike traditional retail or institutional mutual funds, CITs are bank-maintained pooled investment vehicles. Because they are maintained by banks, they sit outside the regulatory perimeter of the Securities and Exchange Commission ("SEC") and are generally exempt from the strict registration and reporting requirements of the Investment Company Act of 1940 and the Securities Act of 1933.

79.    Because of this SEC exemption, CITs operate with a structural opacity that mutual funds do not. CITs are not required to issue publicly available, standardized prospectuses or Statements of Additional Information ("SAIs"). Their detailed fee structures, trading costs, and revenue-sharing arrangements are far less transparent to the public and are not housed in accessible SEC databases.

80.    Furthermore, unlike registered mutual funds, CITs are not required to maintain independent boards of directors.  Mutual fund boards are legally mandated to independently monitor fund management, negotiate sub-advisory fees, and protect shareholders from conflicts of interest. CITs lack this structural, independent safeguard.

81.    Due to this structural opacity and the absence of mutual-fund-style independent governance, ERISA fiduciaries cannot simply rely on public market forces, standardized retail disclosures, or SEC oversight to evaluate CITs.  Instead, fiduciaries who choose to utilize CITs bear a heightened duty to proactively obtain, rigorously scrutinize, and continuously monitor the CITs' governing declarations of trust, participation agreements, audited financial statements, underlying fee schedules, and indirect compensation arrangements.

82.    Regulators have explicitly warned of the dangers of fiduciary complacency regarding CITs. For example, as highlighted in testimony before the Department of Labor's ERISA Advisory Council, the SEC has identified numerous instances where CIT trustees exercised only "minimal" or "cursory" oversight, effectively rubber-stamping the decisions of affiliated investment advisers who performed virtually all investment activities while extracting excessive fees.

/ / /

— 20 —

**CLASS ACTION COMPLAINT**

83.     This heightened duty of independent due diligence was especially critical for the Committee because the opaque JPMorgan target-date CITs were designated as the Plan's QDIA.   Consequently, Defendant defaulted the vast majority of participants' retirement savings into these unregulated vehicles.

84.     The need for rigorous independent oversight was further compounded by the severe conflicts of interest present in the Plan's bundled service arrangement. As explicitly admitted in Lithia's 2024 Form 11-K: "Certain Plan investments are managed by Bank of America, N.A., the trustee of the plan... Certain investment fees are paid by the trustee and are reflected in investment income or loss for the year."

85.     Plaintiff is informed and believes, and on that basis alleges, that Defendant failed to conduct the rigorous, independent evaluation required for these unregistered vehicles. Instead of leveraging the Plan's massive $1 billion+ scale to demand full transparency, negotiate customized fee schedules, or uncover indirect compensation hidden within the CITs' net returns, Defendant exhibited the exact "minimal and cursory oversight" warned of by regulators.

86.     By treating these opaque, unregistered trusts and conflicted proprietary funds as "set it and forget it" investments, Defendant effectively rubber-stamped the investment lineup.   This failure of oversight allowed the Plan's conflicted service providers to extract excessive direct and indirect fees that were netted directly against Plan participants' retirement savings, in direct violation of Defendant's fiduciary duties of prudence and loyalty.

## CLASS ALLEGATIONS

87.     Plaintiff brings this action on behalf of himself and as representative of all others who are similarly situated.   Pursuant to Rules 23(a), (b)(2), and/or (b)(3) of the Federal Rules of Civil Procedure, Plaintiff seeks certification of the following class initially defined as follows:

> *All participants and beneficiaries of the Lithia Motors, Inc. 401(k) Plan, who participated in the Plan at any time within the statute of limitations for*

— 21 —

**CLASS ACTION COMPLAINT**

*each claim pled, excluding Defendant and members of any Plan Committee or board of directors (the "Class").*

88.    Plaintiff and the Class reserve the right under Federal Rule of Civil Procedure Rule 23(c)(1)(C) to amend or modify the class to include greater specificity, by further division into subclasses, or by limitation to particular issues.

89.    This action has been brought and may be properly maintained as a class action under the provisions of Federal Rules of Civil Procedure Rule 23 because there is a well-defined community of interest in the litigation and the proposed class is easily ascertainable.

90.    Numerosity. Fed. R. Civ. P. 23(a)(1).    The members of the Class are so numerous that joinder of all members is impractical.  Based on the Plan's Form 5500 filings, the Plan had approximately 29,235 total participants as of December 31, 2022, with 26,052 participants holding account balances.  The Plan's participant count has continued to grow through 2024.

91.    Commonality and Predominance. Fed. R. Civ. P. 23(a)(2) and (b)(3). Common questions of law and fact exist as to all members of the proposed class and predominate.  These include whether Defendant breached its fiduciary duties by using forfeitures to reduce employer contributions, whether administrative fees were excessive, whether investment selections were imprudent, and whether Defendant failed to properly monitor the Plan's management.

92.    Typicality. Fed. R. Civ. P. 23 (a)(3).  The claims of the named Plaintiff are typical of the claims of the proposed class.  Plaintiff and all members of the class are similarly affected by Defendant's wrongful conduct as participants in the same Plan, subject to the same fee structure, the same investment options, and the same forfeiture practices.

93.    Adequacy of Representation.  Fed. R. Civ. P. 23(a)(4).  Plaintiff will fairly and adequately represent and protect the interests of the members of the proposed class. Counsel who represent Plaintiff are competent and experienced in litigating large and

— 22 —

**CLASS ACTION COMPLAINT**

complex ERISA class actions.

94. <u>Superiority.</u> Fed. R. Civ. P. 23(b)(3). A class action is superior to all other available means for the fair and efficient adjudication of this controversy. Individual joinder of all members of the proposed Class is not practicable, and common questions of law and fact exist as to all class members. Class action treatment will allow those similarly situated persons to litigate their claims in the manner that is most efficient and economical for the parties and the judicial system. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action. Inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct. Adjudications with respect to individual class members would be dispositive of the interests of the other members not parties to the individual adjudications and/or would substantially impair or impede their ability to protect their interests. Defendant has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

**FIRST CLAIM FOR RELIEF**
**BREACH OF ERISA'S PROHIBITED TRANSACTIONS**
**29 U.S.C. § 1106**
**(By Plaintiff And Class Members Against Defendant)**

95. Plaintiff incorporates the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

96. 29 U.S.C. § 1106(a)(1) provides that "[a] fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect . . . (A) . . . exchange . . . of any property between the plan and a party in interest; . . . (C) furnishing of goods, services, or facilities between the plan and a party in interest; (D) transfer to or use by or for the benefit of a party in interest, of any assets of the plan." Defendant is a party in interest, as that term is defined under 29 U.S.C. §1002(14), because it is a Plan fiduciary and/or service provider of the Plan.

— 23 —

**CLASS ACTION COMPLAINT**

97. 29 U.S.C. § 1106(b) provides that "[a] fiduciary with respect to a plan shall not," among other things, "deal with the assets of the plan in his own interest or for his own account."

98. As to forfeited Plan assets: Defendant violated these prohibitions by utilizing at least $17.3 million in Plan assets (forfeited participant balances) to offset its own future employer contributions to the Plan, thereby dealing with Plan assets in its own interest and for its own account, in violation of 29 U.S.C. § 1106(a)(1)(D) and § 1106(b).

99. As to excessive fees paid to parties in interest: Defendant further violated these prohibitions by paying excessive and unreasonable administrative fees from Plan assets to BANA and its affiliate Merrill Lynch, which are fiduciaries and/or parties in interest of the Plan, constituting prohibited furnishing of services between the Plan and parties in interest in violation of 29 U.S.C. § 1106(a)(1)(A) and (C).

100. As a result of these prohibited transactions, Defendant caused the Plan to suffer losses in the amount of the Plan assets that were substituted for future employer contributions, the excessive and prohibited fees paid to fiduciaries or parties in interest, and the lost investment returns on those assets.

101. Pursuant to 29 U.S.C. § 1109(a), Defendant is liable for the Plan losses resulting from violation of ERISA's prohibition on these transactions, as alleged in this claim, and must restore to the Plan all profits secured through its use of Plan assets, and is subject to other equitable or remedial relief as appropriate.

WHEREFORE, Plaintiff and the Class pray judgment against Defendant as hereafter set forth.

### SECOND CLAIM FOR RELIEF
### BREACH OF FIDUCIARY DUTY
### 29 U.S.C. § 1104(A)(1)
### (By Plaintiff And Class Members Against Defendant)

102. Plaintiff incorporates the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

103. Under 29 U.S.C. § 1104(a)(1)(A), Defendant was required to discharge its

— 24 —

**CLASS ACTION COMPLAINT**

duties owed to the Plan "solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries, and (ii) defraying reasonable expenses of administering the plan."  Defendant breached its fiduciary duty under Section 1104(a)(1)(A) by: (a) allowing excessive administrative expenses to be incurred, including recordkeeping fees to Merrill Lynch that grew from $961,929 to $1,633,011 during the relevant period, without proper oversight or competitive bidding; (b) permitting prohibited transactions and/or fees paid to fiduciaries and/or parties in interest; and (c) utilizing at least $17.3 million in forfeited Plan assets for its own benefit, to decrease future employer contributions, rather than for the benefit of Plan participants.  In doing so, Defendant placed its interests above the interests of Plan participants and beneficiaries.

104.  Pursuant to 29 U.S.C. § 1104(a)(1)(B), Defendant was required to discharge its duties with respect to the Plan "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  Defendant breached its fiduciary duty under Section 1104(a)(1)(B) by allowing excessive administrative expenses, prohibited transactions and/or fees paid to fiduciaries and/or parties in interest, and by declining to use the forfeited funds in the Plan for the benefit of Plan participants, instead using such Plan assets to reduce the Company's own contributions to the Plan.

105.  Pursuant to 29 U.S.C. § 1104(a)(1)(D), Defendant was required to discharge duties solely in the interest of Plan participants, and "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of" ERISA.  Defendant breached its fiduciary duty under Section 1104(a)(1)(D) by using forfeited Plan assets, and/or paying fees to parties in interest in prohibited transactions, in violation of ERISA statutes, as alleged herein.

106.  Defendant failed to engage in a reasoned and impartial decision-making process regarding use of forfeited funds, payment of administrative fees, and/or oversight

— 25 —

**CLASS ACTION COMPLAINT**

of investment options.  Defendant's actions in this regard have not been in the best interest of the Plan's participants, and failed to properly consider participants' interests.

107.   Defendant's wrongful conduct, as alleged herein, caused the Plan to receive fewer future employer contributions than it would otherwise receive, and depleted Plan assets.  Defendant's wrongful conduct caused the Plan and/or its participants to pay inflated and prohibited administrative expenses, and to appreciate and/or earn less than the Plan should have.  As a direct and proximate cause of Defendant's fiduciary breaches, the Plan suffered injury and losses and, pursuant to 29 U.S.C. § 1109, Defendant is liable for such losses.

WHEREFORE, Plaintiff and the Class pray judgment against Defendant as hereafter set forth.

### THIRD CLAIM FOR RELIEF
### BREACH OF ERISA'S ANTI-INUREMENT PROVISION
### 29 U.S.C. §1103(c)(1)
### (By Plaintiff And Class Members Against Defendant)

108.   Plaintiff incorporates the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

109.   Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purpose of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

110.   The funds in a participant's accounts that are forfeited when a break in service occurs prior to full vesting are assets of the Plan.

111.   By using Plan assets for its own benefit, to reduce its own future employer contributions to the Plan –  at least $17.3 million from 2020 through 2024 alone – thereby saving itself millions of dollars in contribution costs, Defendant caused the assets of the Plan to inure to the benefit of the employer in violation of 29 U.S.C. § 1103(c)(1).

112.   Pursuant to 29 U.S.C. § 1109(a), Defendant is liable for the Plan losses resulting from violation of ERISA's anti-inurement provision as alleged in this claim, and

— 26 —

**CLASS ACTION COMPLAINT**

must restore to the Plan all profits secured through its use of Plan assets, and is subject to other equitable or remedial relief as appropriate.

WHEREFORE, Plaintiff and the Class pray judgment against Defendant as hereafter set forth.

**FOURTH CLAIM FOR RELIEF**
**IMPRUDENT INVESTMENT SELECTION AND RETENTION**
**29 U.S.C. § 1104(a)(1)(B)**
**(By Plaintiff And Class Members Against Defendant)**

113. Plaintiff incorporates the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

114. Pursuant to 29 U.S.C. § 1104(a)(1)(B), Defendant was required to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." This duty of prudence requires fiduciaries to engage in an objectively prudent process when selecting, monitoring, and replacing investment options for the Plan, and imposes a heightened duty of independent due diligence when transitioning Plan assets into unregistered, structurally opaque investment vehicles like Collective Investment Trusts ("CITs").

115. Defendant breached its duty of prudence by transitioning the Plan's default target-date suite from SEC-regulated mutual funds to the unregistered JPMCB SmartRetirement Passive CITs, which held approximately $570.6 million – over 57% of Plan assets – as of December 31, 2024. Defendant executed this massive transfer of retirement assets without ensuring that participants retained access to standardized, public fee disclosures, without publicly documenting the fee comparison underlying the decision, and without conducting the rigorous, independent evaluation required for unregistered vehicles that lack SEC oversight.

116. Defendant further breached its duty of prudence by exercising only minimal and cursory oversight over these opaque CITs. Rather than rigorously scrutinizing the CITs' governing documents, underlying fee schedules, and revenue-sharing

— 27 —

**CLASS ACTION COMPLAINT**

arrangements – particularly given the severe conflicts of interest posed by the Plan's trustee (BANA) and recordkeeper (Merrill Lynch) – Defendant treated the Plan's largest investment bucket as a "set it and forget it" vehicle, blinding itself and participants to the true, all-in costs.

117. Defendant further breached its duty of prudence by failing to leverage the Plan's enormous asset base – which exceeded $1 billion by December 31, 2024 – to demand full fee transparency, negotiate customized, lower fee schedules for the CITs, or ensure that the reduced transparency of the CIT structure was actually offset by measurably lower fees and superior performance compared to readily available alternatives in the mega-plan marketplace.

118. As a direct and proximate cause of Defendant's imprudent investment selection, retention, and transition, the Plan and its participants were deprived of crucial fee transparency, paid excessive direct and indirect investment management fees, and suffered losses in the form of diminished investment returns. Pursuant to 29 U.S.C. § 1109, Defendant is liable for such losses.

WHEREFORE, Plaintiff and the Class pray judgment against Defendant as hereafter set forth.

### FIFTH CLAIM FOR RELIEF
### FAILURE TO MONITOR FIDUCIARIES
### (By Plaintiff And Class Members Against Defendant)

119. Plaintiff incorporates the preceding paragraphs as if fully set forth herein and, to the extent necessary, pleads this cause of action in the alternative.

120. Defendant oversaw the overall governance of the Plan and had authority to delegate fiduciary responsibilities. Plaintiff is informed and believes, and on that basis alleges, that Defendant administered the Plan and/or appointed administrators and committees to assist in Plan management and delegated to them the authority to handle Plan assets, which led to the issues alleged herein.

121. Defendant had a duty to monitor the persons to whom it delegated fiduciary

— 28 —

**CLASS ACTION COMPLAINT**

responsibilities, and to take prompt action to protect the Plan and correct any breaches of fiduciary duty or violations of ERISA statutes.

122.    Defendant breached its duty to monitor the fiduciaries to whom it delegated responsibility for Plan management by, among other things: (i) unreasonably failing to monitor the use of forfeited funds, permitting at least $17.3 million to be diverted to offset employer contributions; (ii) failing to monitor and reduce the unreasonably excessive administrative expenses paid to Merrill Lynch and other parties in interest; (iii) failing to monitor and replace underperforming and/or higher-cost investment options; and (iv) failing to take steps to ensure that fiduciary duties and ERISA statutes were properly complied with respect to Plan assets.

123.    As a direct and proximate cause of Defendant's breach of its duty to monitor fiduciaries, the Plan and/or its participants suffered losses, as alleged herein.

WHEREFORE, Plaintiff and the Class pray judgment against Defendant as hereafter set forth.

## PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, prays for judgment against Defendant as follows:

(a)    A declaration that Defendant has breached its fiduciary duties and engaged in prohibited conduct and transactions as described above;

(b)    An order that Defendant is liable to make good to the Plan and/or its participants all losses to the Plan resulting from each violation of ERISA described above, including but not limited to restoration of not less than $17.3 million in diverted forfeitures plus lost investment returns thereon, and to otherwise restore the Plan to the position it would have occupied but for these violations;

(c)    An order that all assets and profits secured by Defendant as a result of each violation of ERISA described above be disgorged;

(d)    An order for an accounting to determine the amounts Defendant must make good to the Plan under 29 U.S.C. § 1109(a);

— 29 —

**CLASS ACTION COMPLAINT**

(e)     Removal of the fiduciaries who have breached their fiduciary duties and an injunction against future ERISA violations;

(f)     An order requiring Defendant to conduct a competitive request for proposals for recordkeeping services and to adopt a formal forfeiture policy that benefits Plan participants;

(g)     Surcharge against Defendant and in favor of the Plan for all amounts involved in any transactions which such accounting reveals were improper, excessive and/or in violation of ERISA;

(h)     An order certifying this case as a class action;

(i)     An award of attorneys' fees and costs under 29 U.S.C. § 1132(g)(1) and the common fund doctrine;

(j)     An award to the class representative of a service award;

(k)     An order for the payment of interest to the extent allowed by law; and

(l)     Such other equitable or remedial relief as the Court deems appropriate.

DATED:  February 19, 2026

**HAFFNER LAW PC**

By:  _____
Joshua H. Haffner
Alfredo Torrijos
Vahan Mikayelyan

**SETAREH LAW GROUP**
Shaun C. Setareh
Thomas A. Segal

*Counsel for Plaintiff David Ventura and the Proposed Class*

— 30 —

**CLASS ACTION COMPLAINT**